U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 SEP -6 PM 2: 34

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

THOMAS KIBBIE, )
)
    Plaintiff, )
)
v. ) Case No. 5:16-cv-191
)
CORUM MABIE COOK PRODAN )
ANGELL & SECREST, PLC, and JOHN )
MABIE, ESQ., in his individual capacity, )
)
    Defendants. )

**DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(Docs. 39, 51, 54)**

Defendants John Mabie, Esq. and his firm Corum, Mabie, Cook, Prodan, Angell & Secrest, PLC move for partial summary judgment under Fed. R. Civ. P. 56(a). Defendants move for summary judgment dismissing Count II (Breach of Fiduciary Duty) and Count III (Breach of Duty of Good Faith and Fair Dealing) as duplicative of Count I (Professional Negligence). Additionally, Defendants move for summary judgment dismissing Count IV (violation of the Vermont Consumer Protection Act) because the claim arises from Defendants' legal services.

Defendants also move for summary judgment on three issues pertaining to Plaintiff's alleged damages. First, Defendants move to dismiss Plaintiff's alleged damages for emotional distress, arguing such damages are not available under Vermont law. Second, Defendants ask this court to find that, for the purposes of damages, Plaintiff's average weekly wage was $27.23. Third, Defendants ask this court to exclude any damages for past or future medical treatments of Plaintiff's neck injury.

1

The court held a hearing on Defendants' motion on March 27, 2018, at which time the court took the motion under advisement. For the reasons discussed below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

**Background**

In January 2008, Plaintiff worked as a volunteer "ski ambassador" for the Killington Ski Resort ("Killington"). (Doc. 1 ¶ 7.) As a ski ambassador, Plaintiff would ski trails and assist customers with equipment or directions. (*Id.* ¶ 8.) On January 12, 2008, Plaintiff fell and sustained serious injuries while working at Killington. (*Id.* ¶ 10.)

As a result of his fall, on July 23, 2008, Plaintiff entered into an Agreement for Temporary Total Disability Compensation with Killington's workers' compensation insurer, MEMIC Indemnity Company (MEMIC). (Doc. 39-5.) MEMIC agreed to pay Plaintiff $24.51 per week from January 16, 2008 up until the end of Plaintiff's total disability. (*Id.*) MEMIC came to this amount by calculating Plaintiff's average weekly wage, which it determined was $27.23 based on the value of a season ski pass that Killington gave to Plaintiff in lieu of salary. (*Id.*)

On October 21, 2008, Plaintiff contacted Defendants to represent him in connection with his workers' compensation claim against Killington and MEMIC. Both parties agreed, and Plaintiff entered into a fee agreement with Mr. Mabie on December 29, 2008, which stipulated that Mr. Mabie would receive 33 1/3% of the gross amount of permanency and/or contested temporary benefits recovered on Plaintiff's behalf. (Doc. 39-6.) Plaintiff then reached a partial settlement with MEMIC. (Doc. 39-10.) Plaintiff and MEMIC signed a Modified Form 15 (the form approved by the Vermont Department of Labor for lump-sum settlement of workers' compensation claims) and Addendum. Plaintiff received $50,000 in return for full and final

2

settlement of "all claims occurring as a result of the work incident including but not limited to right ankle, head/TBI and right elbow/biceps," but left open all future medical treatment relating to "cognitive or other head injury, including neurological, psychological, ophthalmological, TBI care and treatment." (*Id.*) From this settlement, Defendants received $15,000 in attorney's fees. (Doc. 39-11.)

After the settlement, Mr. Mabie continued to represent Plaintiff in his efforts to recover medical expenses for his head injury. Plaintiff and Mr. Mabie did not enter into a new fee agreement; Mr. Mabie says that he was essentially helping Plaintiff without compensation. (Doc. 44-1 at 8.) The Department of Labor ordered payment for approximately $1,800 worth of items in an order dated January 31, 2012 and amended on February 6, 2012. (Doc. 44-2 at 1.) The Department awarded Mr. Mabie's firm $2,500.00 in attorney's fees for his work to obtain payment for these and other medical treatment items. (*See id.* at 2.)

On April 16, 2013, Defendants filed a motion to withdraw as counsel, citing a breakdown of communication and cooperation between Plaintiff and Mr. Mabie. (Doc. 39-12.) After the Department of Labor granted this motion, Plaintiff retained new counsel to represent him in challenging the settlement between Plaintiff and MEMIC, arguing it covered future medical treatment of Plaintiff's "neck injuries." In a February 23, 2016 ruling, the Department of Labor held that the settlement did not require MEMIC to provide for past or future medical coverage of plaintiff's neck injury. (Doc. 39-13.) Plaintiff appealed this decision to the Rutland Superior Court where, on November 29, 2017, a jury returned a verdict in Plaintiff's favor and found that the ongoing treatment, medical services, and supplies related to Plaintiff's neck were "necessary for the treatment of [Plaintiff's] cognitive or other head injury," which MEMIC was required to provide for pursuant to the settlement. (Doc. 39-15.)

3

Plaintiff filed suit against Defendants on July 6, 2016, alleging professional negligence (Count I), breach of fiduciary duty (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and violation of the Vermont Consumer Protection Act (Count IV). (Doc. 1 ¶¶ 35–59.)

## Analysis

### I. Summary Judgment Standard and Applicable Substantive Law

This court may only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under this standard, the court must resolve all ambiguities and draw all justifiable factual inferences in the light most favorable to the nonmoving party. *Id.* at 255; *Purdy v. Zeldes*, 166 F. Supp. 2d 935, 940 (D. Vt. 2001).

In this diversity action, Plaintiff's professional negligence, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, and consumer protection claims each have their source in state substantive law, and therefore Vermont law applies. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008); *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 n.4 (2d Cir. 2006).

### II. Whether to Dismiss Claims as Duplicative

Defendants argue that Plaintiff's claims for breach of fiduciary duty (Count II) and breach of implied covenant of good faith and fair dealing (Count III) are duplicative of his professional negligence claim (Count I) and should therefore be dismissed. The court will address the claims separately.

A.      **Breach of Fiduciary Duty (Count II)**

The court begins by reviewing the state of the law on breach-of-fiduciary-duty claims for lawyers accused of wrongdoing by their clients. Vermont recognizes that lawyers owe fiduciary duties to their clients. *See DeYoung v. Ruggiero*, 2009 VT 9, ¶ 28, 185 Vt. 267, 971 A.2d 627 (lawyer is a fiduciary); *In re Conner*, 2006 VT 131, ¶ 10, 181 Vt. 555, 917 A.2d 442 (mem.) (same); *In re Capriola*, 134 Vt. 548, 367 A.2d 689 (1976) (per curiam) (same). It is true that in *Bloomer v. Gibson*, the Vermont Supreme Court stated that "an action to recover for legal malpractice lies in tort, on the theory of the attorney's negligence." 2006 VT 104, ¶ 24, 180 Vt. 397, 912 A.2d 424. But in context that statement does not rule out all other potential theories; the Court went on to state that a breach-of-contract theory might be appropriate in a case where the plaintiff alleged breach of "specific or special obligations" in the contract. *Id.*

The Vermont Supreme Court has cited the Restatement (Third) of the Law Governing Lawyers, which explicitly contemplates actions based on negligence or on breach of fiduciary duty. *See Vincent v. DeVries*, 2013 VT 34, ¶ 26, 193 Vt. 574, 72 A.3d 886 (citing Restatement (Third) of the Law Governing Lawyers § 53 cmt. b).[1] The Restatement acknowledges the potential overlap between negligence and fiduciary breach theories. Restatement (Third) of the Law Governing Lawyers § 49 cmt. c ("Many claims brought by clients against lawyers can reasonably be classified either as for breach of fiduciary-duty or for negligence without any difference in result."). Yet nothing in the Restatement suggests that fiduciary breach claims should be dismissed as duplicative. *See id.* § 49 (claims based on fiduciary duty are available "[i]n addition to the other possible bases of civil liability"). Nevertheless, some commentators—

---

[1] Notably, the comment cited by the *Vincent* Court specifically mentions "lawyer-negligence *or* fiduciary-breach" actions (emphasis added).

including the Restatement's chief reporter, Professor Charles W. Wolfram—maintain that claims against lawyers for fiduciary breach raise concerns "because of their almost complete and useless overlap with available claims of negligence." Charles W. Wolfram, *A Cautionary Tale: Fiduciary Breach as Legal Malpractice*, 34 Hofstra L. Rev. 689, 692 (2006) ("*Cautionary Tale*").

Here, Defendants seek dismissal of Count II on the basis of court decisions that have attempted to minimize that overlap. Defendants rely on cases interpreting New York law holding that "where a claim for breach of fiduciary duty is 'premised on the same facts and seeking the identical relief' as a claim for legal malpractice, the claim for fiduciary duty 'is redundant and should be dismissed.'" *Nordwind v. Rowland*, 584 F.3d 420, 432–33 (2d Cir. 2009) (quoting *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 780 N.Y.S.2d 593, 596 (N.Y. App. Div. 2004)); *see also* 2 Ronald E. Mallen, *Legal Malpractice* § 15:3 (2018 ed.).

According to Professor Wolfram, New York is among a "small minority" of jurisdictions that have expressed such "restiveness" about resorting to fiduciary breach concepts. Wolfram, *Cautionary Tale*, 34 Hofstra L. Rev. at 721. Professor Wolfram describes the New York decisions on this point, including *Fashion Boutique of Short Hills*, as "perfunctory" and "providing no supporting reasoning." *Id.* at 725 & n.139. The applicable federal pleading rules would certainly be no basis for these holdings because the rules permit a plaintiff to assert multiple theories. *Id.* at 726; *see also Top Ridge Investments, LLC v. Anichini, Inc.*, No. 5:16-cv-76, 2017 WL 3016787, at *10 (D. Vt. July 14, 2017) (noting that Fed. R. Civ. P. 8(d)(2) authorizes the filing of inconsistent and alternative theories of recovery).

Despite criticizing the New York decisions for failing to state their rationale, Professor Wolfram maintains that there are good reasons for imposing limits on fiduciary breach claims. Wolfram, *Cautionary Tale*, 34 Hofstra L. Rev. at 726. He notes that "theory proliferation" is not unusual in the law, but that permitting fiduciary breach as a parallel theory in lawyer misbehavior cases is unfair to defendants, both by injecting prejudicial rhetoric into the case and by creating a "stacking" problem where the plaintiff has a chance to "roll the dice twice." *Id.* at 729–30. Professor Wolfram concludes that "[c]ourts should resist the appeals of lawyers for plaintiff-client to proliferate theories of recovery that merely overlap each other." *Id.* at 738. Still, he maintains that fiduciary breach should remain available in "emerging applications" and in certain areas where "the primary substantive theory of recovery has traditionally been recognized to be that of fiduciary breach," such as where the lawyer entered into an impermissible business transaction with the client, profited by misusing the client's confidential information, or intentionally inflicted harm on the client. *Id.* at 732.

The Vermont Supreme Court has not indicated whether it would join New York and a minority of other states that have placed restrictions on fiduciary breach claims. Absent any such indication from Vermont authorities on this point, the court is unwilling to dismiss any portion of Count II merely because of potential overlap with the facts alleged in Count I. As noted above, the Restatement does not contemplate dismissal of fiduciary breach claims on such grounds. The court is satisfied that problems of duplicative pleading and of overlapping theories of recovery are best resolved at trial through the use of a jury instruction. The court will not foreclose alternative theories of recovery prior to trial.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing (Count III)

Plaintiff claims that Defendants breached their duties of good faith and fair dealing. (Doc. 1 ¶¶ 50–54.) Defendants assert that Count III should be dismissed as duplicative of the professional malpractice claim. (Doc. 39 at 6–7.) According to Plaintiff, Defendants breached the covenant of good faith and fair dealing "in regards to the negotiation and settlement of the Modified Form 15 and in the taking of an award of attorney fees without Plaintiff's knowledge." (Doc. 42 at 6.) Plaintiff insists that Count III is distinct from Count I because "Defendants gained financially from both the settlement and receipt of attorney fees." (*Id.* at 7.) Defendants maintain that Plaintiff has identified no separate harm justifying the need for a separate cause of action, and that there is no authority for liability on such a theory. (Doc. 44 at 4–5.)

As with their bid to dismiss Count II, Defendants' position is that Count III should be dismissed on the basis of cases applying New York law that have dismissed claims as duplicative. But as described above, the Vermont Supreme Court has not indicated whether it would adopt the New York rationale for dismissing theories as duplicative. There is some uncertainty in Vermont case law about whether breach of the implied covenant of good faith and fair dealing may be included in a case that also includes an express breach-of-contract claim. *Top Ridge*, 2017 WL 3016787, at *9. But Plaintiff has not asserted a breach-of-contract claim. And insofar as this is a question of pleading, the federal rules of procedure govern, and they authorize the filing of alternative theories. *Id.* at *10.

## II. Consumer Protection Act (Count IV)

Attorneys are potentially subject to suit under the Vermont's Consumer Protection Act ("CPA"), 9 V.S.A. §§ 2451–2482d. *See Kessler v. Loftus*, 994 F. Supp. 240, 242 (D. Vt. 1997) ("There is no blanket exclusion of practitioners of law from the prohibitions of Vermont's

8

CFA.").[2] However, the Vermont Supreme Court has held that "although certain representations may give rise to a malpractice claim, they are generally not actionable under the Consumer Fraud Act if they are the product of the defendant's 'professional judgment based upon his legal knowledge and skill.'" *Webb v. Leclair*, 2007 VT 65, ¶ 23, 182 Vt. 559, 933 A.2d 177 (mem.) (quoting *Kessler*, 944 F. Supp. at 243). Thus in Vermont there is a distinction between the "commercial, entrepreneurial aspects of law and the legal, advisory, analytical aspects of law," the latter of which is exempt from the CPA. *Kessler*, 994 F. Supp. at 242–43. The "commercial, entrepreneurial aspects of law include advertising, billing and collection practices, fee arrangements, and methods of obtaining, retaining and dismissing clients." *Id.* at 243. "If a lawyer's misrepresentations affect one of these aspects, they will be actionable under the CFA." *Id.*

Plaintiff claims Mr. Mabie was deceptive because he failed to pursue workers' compensation wages and vocational rehabilitation benefits; failed to inform Plaintiff about the pros and cons of the Modified Form 15; failed to advise Plaintiff that the Modified Form 15 would exclude benefits for his neck injury; took attorney's fees without informing Plaintiff; and failed to provide billing information or notice regarding the award of attorney's fees. Following the reasoning from *Winton*, *Kessler*, and *Webb*, this court finds that the majority of this argument concerns Mr. Mabie's legal *opinion*, that is, his discussion (or alleged lack thereof) regarding the legal meaning and effect of the Modified Form 15.

---

[2] The statute at issue used to be called the "Consumer Fraud Act" (CFA), but the Vermont Legislature changed the name to the Consumer Protection Act (CPA) in 2012. *See McKinstry v. Fecteau Residential Homes, Inc.*, 2015 VT 125, ¶ 4 n.1, 200 Vt. 392, 131 A.3d 1123.

That leaves Plaintiff's argument as it pertains to attorney's fees. That issue is within the aspects of the law that can be actionable under the CPA. As noted in *Kessler*, "billing and collection practices [and] fee arrangements" are included in the "commercial, entrepreneurial aspects of law" and are therefore within the bounds of the CPA. *Kessler*, 994 F. Supp. at 243. The question here is whether Mr. Mabie made any relevant misrepresentations or omissions likely to mislead. *See McKinstry v. Fecteau Residential Homes, Inc.*, 2015 VT 125, ¶ 10, 200 Vt. 392, 131 A.3d 1123 ("To establish a consumer fraud claim under the Act, a plaintiff must show that the defendant made a misrepresentation or omission likely to mislead consumers; that the plaintiff's interpretation of the misrepresentation or omission was reasonable; and that the misrepresentation or omission was material in that it affected the plaintiff's purchasing decision.").

On that question, the summary judgment record reveals the following. Regarding the $2,500 in fees awarded to his firm in early 2012, Mr. Mabie testified at his November 16, 2017 deposition:

> The fee application that went to the Department was copied to Tom [Kibbie] with all the details. He knew we were seeking the fees. He never suggested that we weren't entitled to those fees. And he wasn't paying us, nor were we seeking payment from him, for any part of anything that we were getting for him, so to speak.

(Doc. 44-1 at 13.) It is undisputed that, after the $2,500 fee was awarded, Mr. Mabie did not write a letter to Mr. Kibbie informing him that the firm had received a $2,500 check, or that the firm believed that it was entitled to the fees, or that Mr. Kibbie would not be receiving any funds out of the $2,500 award. (*Id.*) According to Mr. Kibbie's February 20, 2018 affidavit:

> Subsequently to the representation of Attorney Mabie I learned that I was awarded Attorney Fees and Attorney Mabie and his law firm took the award of Attorney Fees for himself and his law firm without ever notifying me that he was taking these fees for himself.

10

(Doc. 42-3 ¶ 16.)

Here, Plaintiff asserts that Mr. Mabie made a misleading omission by failing to explicitly articulate how fee awards would be handled for the post-Form 15 work that Mr. Mabie agreed to do to recover medical expenses. But the prior contingency fee agreement did not create any expectation that Plaintiff would be entitled to a portion of attorneys' fees. And the Workers' Compensation Rule governing attorney fees and costs in the proceedings before the Department specified in pertinent part that "[a]ny amount awarded shall be paid by the employer/carrier directly to the claimant's attorney in a lump sum." Vt. Workers' Compensation Rule 10.1100, available at http://labor.vermont.gov/wordpress/wp-content/uploads//Rule-10.0000-Attorney-Fees-Costs.pdf. In addition, since Mr. Mabie was representing Mr. Kibbie without charge, any fee award would most naturally go to Mr. Mabie to avoid a "windfall" to the client. 1 Robert L. Rossi, *Attorneys' Fees* § 6:12 (3d ed.).

In short, failure to state that Mr. Kibbie was not entitled to any fee award could not have been a misrepresentation because there was no such entitlement. The only other conduct that Plaintiff identifies to support his CPA claim is Mr. Mabie's failure to send an accounting or communication about the fees after they were awarded. But that omission occurred well after the parties entered into their oral post-Form 15 agreement. It cannot have affected any decision by Mr. Kibbie to "purchase" those services. Defendants are accordingly entitled to summary judgment on Count IV.

### III. Issues Relating to Damages

"The plaintiff has the burden of showing all elements of a legal malpractice case, including damages." *Vincent*, 2013 VT 34, ¶ 28. "The measure of damages for malpractice is all damages proximately caused by the wrongful act or omission." *Bloomer*, 2006 VT 104, ¶ 27

11

(internal quotation marks omitted). Defendants seek summary judgment on three aspects related to Plaintiff's damages case: (1) Plaintiff's request for emotional distress damages; (2) the weekly wage calculation that would be used to calculate allegedly lost benefits; and (3) damages related to Plaintiff's "neck injury."

### A. Emotional Distress Damages

In his complaint, "Plaintiff seeks damages for the emotional stress caused by the negligent acts of the Defendants." (Doc. 1 at 9.) Although never expressly so holding, the Vermont Supreme Court has suggested "that under certain exceptional circumstances, emotional distress damages might be available for legal malpractice." *Vincent*, 2013 VT 34, ¶ 10 (citing *Fitzgerald v. Congleton*, 155 Vt. 283, 292 n.7, 583 A.2d 595 (1990)). Without defining the exact contours of this standard, the Court went on to note that, in the absence of either physical impact or substantial bodily injury, courts in other jurisdictions have awarded emotional distress damages only when the legal malpractice arose out of a contract to perform services where a breach would lead to a "deeply personal injury," such as a loss of liberty or separation from the client's child. *Id.* ¶ 22. The Court recognized that the "modern trend" is to allow damages "under certain circumstances for serious emotional distress in legal malpractice claims," but found it unnecessary to decide whether Vermont law follows that modern trend. *Id.* ¶ 25.

In this case, Plaintiff's claims are primarily economic in nature. The subject of Mr. Mabie's representation was not "of such a personal and emotional nature that it would support an exception to the general rule disallowing recovery of emotional distress damages in the absence of either physical impact or substantial bodily injury or sickness." *Id.* Accordingly, Plaintiff's claims do not support an exception to the general rule excluding damage for emotional distress,

and he cannot pursue a claim for emotional distress damages. Summary judgment is granted to Defendants in this regard.

### B. Weekly Wage Calculation

Plaintiff seeks "economic damages for lost Temporary Total Disability benefits and/or Permanent Total Disability benefits, and/or Permanency Benefits for his workers' compensation injuries." (Doc. 1 at 9.) Those alleged lost benefits would be calculated under Vermont's Workers' Compensation laws. The calculation of the allegedly lost benefits depends on the injured individual's "average weekly wages." *See* 21 V.S.A. §§ 642 (temporary total disability benefits), 644 (permanent total disability). "Average weekly wages" is defined by 21 V.S.A. § 601(15) as the sum computed under 21 V.S.A. § 650.

Under § 650, an injured employee may only include concurrent employment wages in his weekly wage calculation if the concurrent employers were insured with workers' compensation insurance or guaranty insurance. *See* 21 V.S.A. § 601(8) (defining "insurance carrier" under the Workers' Compensation Act). Plaintiff claims that he was caring for his grandfather during the relevant period before his injury at Killington, and that his grandfather "was insured through homeowners." (Doc. 42 at 13.) He also asserts that, after his grandfather's passing and a week before his injury, he "restarted his construction business and had contracts ready to go." (*Id.*)

But Plaintiff fails to provide evidence or documentation of his grandfather's coverage, or that such coverage included workers' compensation. Additionally, he provides no evidence or documentation—or even makes the argument—that he was a self-insurer approved by the Department of Labor for his construction business as required by the statute. For these reasons, his caregiving wages and construction wages cannot be included in his weekly wage calculation.

13

Additionally, Plaintiff claims that his weekly wage calculation should have included four ski passes, not one, because he received three additional ski passes from Killington for his wife and two children. For the purposes of weekly wage calculations, the term "wages" includes "bonuses . . . which can be estimated in money and which the employee receives from the employer as part of his or her remuneration." 21 V.S.A. § 601(13). As the parties agree, ski passes qualify as "wages." *See D.H. v. Jay Peak*, Op. No. 59-05WC, 2005 WL 3817403 (Vt. Dep't of Labor & Industry Sept. 20, 2005); *Gaboric v. Stratton Mountain*, Op. No. 12-04WC, 2004 WL 957713 (Vt. Dep't of Labor & Industry Apr. 26, 2004).

However, "if the injured worker continues to receive any of these benefits during the period of his or her temporary disability, the value of such benefit shall not be included in his or her temporary disability compensation rate." 13-4 Vt. Code R. § 1:8.1130. Here, Plaintiff's wife and children did not lose the benefit of their ski passes. (Doc. 44-5 at 2.) Killington did not take the ski passes away, so Plaintiff only lost the benefit of using his single ski pass. Accordingly, the additional three ski passes cannot be included in the weekly wage calculation. Thus, for the purposes of calculating damages, Plaintiff's average weekly wage will be considered $27.23.

## C. Damages Related to Plaintiff's "Neck Injury"

In his July 2016 complaint, Plaintiff claims that Defendants negligently failed to include Plaintiff's "neck injury" in the Modified Form 15. (*See* Doc. 1 ¶¶ 26–27.) He says that as a result of that poor drafting, he lost the ability to claim a permanency for his neck injury. (*Id.* ¶ 31.) In their motion for summary judgment, Defendants point out that on November 29, 2017, the jury in the Superior Court "determined that the settlement agreement between Plaintiff and MEMIC covered ongoing treatment, medical services and supplies for Plaintiff's neck pain and cervicalgia." (Doc. 39 at 13.) Indeed, the jury answered "yes" to the special interrogatory

14

question asking whether "ongoing treatment for Mr. Kibbie's neck pain [is] 'necessary for the treatment of [Mr. Kibbie's] cognitive or other head injury.'" (Doc. 39-15 (second brackets in original).) As a result of the jury's verdict, according to Defendants, "Plaintiff has not suffered damages for the cost of treatment for his neck injury." (Doc. 39 at 13.)

Plaintiff disagrees. He maintains that the jury compensated him for "neck pain," but that he is still entitled to compensation for his "neck injury" that is not covered by the "neck pain." (Doc. 42 at 15.) He says that the Superior Court "drew a fine line between these two issues." (*Id.*) According to Plaintiff, the Superior Court found that recovery for "neck injury" was barred by the Form 15 agreement. (*See id.* at 3.) Plaintiff also seeks attorney fees and expenses incurred in the Superior Court proceedings to "correct" Defendants' alleged malpractice. (*Id.* at 16.) Defendants assert that Plaintiff "offers no evidence of any request[s] for neck treatments that were denied." (Doc. 44 at 8.) At the March 27, 2018 hearing, Plaintiff represented that, based on a report of consultant April Pettengill, a sum of $330,000 is outstanding for Plaintiff's "neck injury" that was not included in the jury's award.

Many details about Plaintiff's claim to recover for his "neck injury" are unclear at this point. However, it seems reasonably clear that Plaintiff has evidence of damages related to his neck that were not included in the jury award. Defendants' simple reference to the jury award in their motion for summary judgment is insufficient to rule out other potential damages. The court will accordingly deny this aspect of the summary judgment motion.

## IV. Post-Hearing Motions

### A. Motion to Strike Defendants' July 16, 2018 Letter (Doc. 51)

On July 16, 2018, while Defendants' motion for summary judgment was under advisement, Defendants filed a letter to "provide notice" that they "intend to supplement their

15

motion for summary judgment and to request dismissal of all of plaintiff's causes of action[]
because plaintiff has no damages." (Doc. 50.) Plaintiff filed a motion to strike the letter on
July 18, 2018, asserting that it is inappropriate and that Defendants must file a motion if they are
requesting action from the court. (Doc. 51.) That motion is DENIED; there is no basis to strike
the letter. It is not a motion and does not seek any relief or other action from the court.
Defendants have since filed a Motion for Leave to file supplemental summary judgment papers.
The court discusses that motion below.

### B.     Motion for Leave to File Supplemental Summary Judgment Papers (Doc. 54)

On July 30, 2018, Defendants filed a motion for leave to submit supplemental summary judgment papers. (Doc. 54.) In the Supplement, Defendants present new arguments in support of a motion for summary judgment on all issues. These arguments are:

- Plaintiff has produced no expert testimony that the $50,000 settlement was unreasonably low. Defendants' expert has testified that settlement was "within a range of reasonable settlements." Since Plaintiff's claim is that he was advised to enter into an unreasonably low settlement, he cannot prevail without proof that the settlement was too low.

- Plaintiff is now assured of coverage for past medical expenses for both his head and his neck because he prevailed in his workers compensation case against MEMIC. MEMIC provides workers compensation coverage to Killington. Plaintiff and MEMIC participated in a jury trial in Vermont Superior Court. The jury ruled in favor of Plaintiff and held that MEMIC was required to treat his neck and his head injury.

- Plaintiff is similarly assured of coverage for future medical expenses for his neck because of the same jury verdict.
- Plaintiff has no legal basis for a claim for attorneys fees he incurred in pursuing MEMIC for coverage for the neck injury.

These are new issues. The court will consider them in the context of a second summary judgment motion. The court accepts Defendants' supplemental filing. The court will consider Plaintiff's response (Doc. 56) and Defendants' reply (Doc. 57) and issue a separate ruling. In the meantime, the court issues the present decision in an effort to resolve the issues raised in the original motion for partial summary judgment. The motion for leave to submit supplemental summary judgment papers (Doc. 54) is GRANTED.

The court's Conclusion appears on the following page.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 39) is GRANTED in part and DENIED in part. The motion is denied insofar as it seeks dismissal of Counts II and III, and insofar as it seeks an order excluding any claim for damages related to Plaintiff's "neck injury." The motion is granted with respect to Count IV and Plaintiff's claim for emotional distress damages. For the purposes of calculating damages, Plaintiff's average weekly wage will be considered $27.23.

Plaintiff's Motion to Strike (Doc. 51) is DENIED.

Defendant's Motion for Leave to File Supplemental Summary Judgment Papers (Doc. 54) is GRANTED.

Dated at Rutland, in the District of Vermont, this 6 day of September, 2018.

Geoffrey W. Crawford, Chief Judge
United States District Court